5, 2763, Skolarus v. Bloomberg. Good morning, Your Honors, and may it please the Court, I'm Avery Haupt on behalf of Plaintiff Appellants. I have reserved three minutes for rebuttal. Plaintiffs allege Bloomberg manipulated the bond market by abusing its power as an unregulated bond indexer to increase interest rates on bonds. Even though Bloomberg does not dispute that bond indexing is unregulated, the district court dismissed the case based on the filed rate doctrine by misapplying this court's precedent in Simon v. Keesman. Simon set the rule for when the filed rate doctrine can apply to market-based rates where it usually would not apply. Under Simon, the filed rate doctrine applies to market-based rates only if sufficient safeguards protect against market manipulation to justify courts deferring to regulators that can actually address the misconduct, safeguards like the regulator tightly controlling the market-setting rates, such as the power to impose rate caps, the power not only to review rates but fix them after review, the power to investigate and remedy market manipulation. But Bloomberg concedes that none of the safeguards in Simon are present here and cites no case applying the filed rate doctrine to a regulator powerless to remedy the alleged misconduct. That's because they're... Well, Texas and California law require the PUCs to make sure that the bond interest rates are reasonable, right? The Texas and California Public Utility Commissions here have no control over interest rates set in the U.S. bond market. They do not decide, they don't have the power to decide whether a rate is reasonable or not because they don't have the power to decide whether a rate should be changed or can be changed. They could have refused to allow a rate bond altogether, couldn't they? So yes, the PUC's only option is to withdraw approval of the entire bond issuance. And that does not equate to regulatory power over interest rates, over the bond market or bond indexing. It's nothing like the safeguards. The PUC set up this system, right, to have this type of fundraising to deal with these disasters that have happened and then had the ultimate power to reject the bonds being  So what happened, what would happen if the PUC had actually rejected the issuance of the bonds? I know one of them, there was a very short period. The others, perhaps Texas, but the others, there was some period of time and the PUC's could have rejected. I couldn't find in either brief, other than maybe speculation, but what would happen if the PUC said, you know what, the interest rates are too high. They knew, they certainly had advanced notice that the interest rates would be higher because of the reclassification of the bonds, what would happen? So a few responses, Your Honor. First, there's no evidence in the record that the PUC's knew about Bloomberg's misclassification before issuance of any of these bonds, but they couldn't do anything about that classification anyway. They can't order Bloomberg to change that classification. I thought there was some press coverage and some discussion publicly that there was going to be a reclassification and the impact of that reclassification and that even different interest groups were needing to deal with that. So are you saying that the only knowledge that the interest rate would have been higher was when they received the request to approve the issuance of the bonds? I thought it was, there was some advanced notice at least. There is no evidence in the record that the PUC's knew of Bloomberg's misclassification before the interest rates, before they approved issuance of the bonds or before the bonds issued. But that doesn't even matter in this case. It's relevant, but Simon explicitly said, in response to your point about whether the PUC set up this system, Simon said it's not enough for a regulator to create a process. I understand the Simon factors. I understand the Simon factors. All I'm asking is, and I understand that they didn't know ultimately what the interest rate was going to be until they got the request to approve the bonds, but it was not news to the PUC's that the interest rates would be higher and that there was a move towards reclassification. Are you saying that it was absolutely news to them? There is no evidence in the record that they knew about it. There is no, Bloomberg, for example, in its, it's entirely out, bond classification is entirely outside PUC expertise. Bloomberg argued that in the district court. I'm sorry. Let me put the question in a slightly different way. Simon, as it was written, does not directly apply. You're correct. But the basic notion that courts are not very well suited to step into these rate issues, which motivated Simon, is still there. So the question before us is, was there sufficient power generally on the part of these agencies so that it is still advisable for courts to stay out of the business? That's, you know, technically, of course, the specific things that Simon said allowed them to apply the doctrine there are not here quite. But is there enough so that we should say we should stay out? Your Honor, I think you phrased that exactly correctly. The question is, do the regulators have enough power to justify court deference to these agencies? And that goes back, I think, to a prior question, which is, what would happen if the bond issuance was withdrawn, if approval was withdrawn? And it would not remedy the misconduct here. Even if PUCs withdrew approval for a particular bond, utilities could not then go back to the market and get a rate unaffected by Bloomberg's misclassification. Bloomberg's misclassification made all recovery bond interest rates higher than they would be otherwise, regardless of whether a PUC withdraws approval for a particular bond. The PUCs don't have power to change Bloomberg's classification or regulate Bloomberg in any way. And as you said, Your Honor. The SEC did do something that suggested a higher rate was justified, didn't it? No. The SEC as an agency has not taken that position. There was an SEC staffer letter. But more importantly for this appeal, there's no dispute that even the SEC does not regulate bond classification. Bloomberg polices itself on bond classification, which is why the filed rate doctrine is inappropriate here. Well, the SEC would be a regular, you know, in terms of the Simon factor on the ability to investigate, I agree with you. The PUCs don't have the ability to investigate, but certainly the SEC would. And I thought the SEC Division of Corporate Finance issued guidance on July 31st, 2024, that supported the reclassification of these bonds. Did I misread that? So the SEC did issue, an SEC, I'm sorry, an SEC staffer did issue guidance. That is correct. The question for this Court is not whether the classification was proper or improper. It's does the, do the public utility commissions have power over that classification or the resulting interest rates. And the answer is no. But to the extent the SEC thought, you know, Bloomberg is committing fraud here, manipulating the market, doing something, they didn't have to do that. They could have started an investigation. Bloomberg does not dispute that its bond indexing is not regulated by the SEC. There is no SEC regulation or any regulation whatsoever in the United States for bond indexing. Bloomberg does not dispute that. They police, Bloomberg polices itself on bond indexing. And that's why the district court's opinion here, apply the filed rate doctrine where it's never been applied before, which is an unregulated conduct of an unregulated defendant, manipulating a market and a rate that regulators have no control over, which is contrary to Simon, which is the only precedent that's applicable to this case. Thank you. Thank you, counsel. You're reserved a couple minutes. Thank you, counsel, your honors. Good morning. May it please the court, Dana Sessions, Davis Polk and Wardwell, LLP, on behalf of appellees here. The exchange with my colleague on the other side, I think, just reinforces how and why the district court's decision here should be affirmed. Plaintiffs here challenge the reasonableness of rates charged on their utility bills pursuant to a process that was set up and blessed by the utility regulators. They seek damages in this case that are based on alleged overcharges they pay on their utility bills as a result of this rate-setting process that was reviewed and approved. That is evident from their complaint in various places. That is almost all the court needs to know to affirm. However, in the colloquy that just unfolded about regulations and who has authority to regulate, the point here is clear. The PUCs in Texas and in California set up the process. They reviewed and approved the rates at issues. And plaintiffs cannot undo that process because they think there should be different or alternative regulation of the bond indexing market in the United States. Counsel. Yes. If a third party, Bloomberg, fraudulently or for conspiracy reasons does something that needs to be raised and that the utility doesn't really know of this and then the rates are there, the utility can, let's assume, has only the power to say, send these back. It can't investigate. It can't do any of the things in Simon or there. Is it appropriate in that situation for courts simply to stay out because one of the things when the agency has done certain things, we have said it is better for us to stay out? Is there a situation in which the court should be able in a third party suit to look into what the third party has done rather than the rates? I would submit, Your Honor, that in the circumstances you've just posited under this court's filed rate jurisprudence, there is not a scenario where the court can entertain those claims if the challenge is to a filed rate as defined in the Second Circuit. So your position is that no matter what a third party did that caused the rate to be one that damaged the plaintiffs, the courts cannot step in. But the filed rate doctrine goes that far to that extent, which is beyond what Simon. I'm not saying you're wrong. I'm not saying you're wrong. It's just a question of how much courts should defer to agencies in this situation. And keep in mind that this is in the context where courts deferring to agencies has been called into question in other contexts by the Supreme Court. Understood, Your Honor. And I think the Wagoland case that this court issued answers the question on how far the court can or should go in a circumstance where there are allegations of fraud. That case essentially, the plaintiffs there argued for a fraud exception to the filed rate doctrine. The allegations were that there were fraud and collusion to defraud the state and ultimately, you know, the regulators that set the rates. And the court said no. The court declined to entertain the fraud exception in Wagoland. And I think similarly in Simon, there was investigation, but it was after the fact. And if one thinks about the investigation in Simon, FERC investigated and found the activity was lawful. But the Department of Justice investigated also and actually entered a consent decree for a $12 million settlement in that case. Does it matter here that this is a diversity case involving just State law claims and State-approved rates? I mean, in both Wagoland and Simon, there was a Federal component, and I don't see that here. There was indeed Federal components in both those cases, Your Honor, but there were State components as well. Wagoland involved State regulators and State law claims. Simon involved State law claims, but Rothstein, which we've not talked about yet this morning, was a case where the actual insurance rates that were at issue there, the filed rates, were approved by the State regulators, and there were both Federal and State law claims there as well. So based on those cases, we would submit that that is not relevant to the court's ruling here. I have the same question I had for your opponent, which was the briefs didn't focus entirely on this, but my question to you is, in your brief at page 9, you said that after market developments on June 8, the defendants publicly announced that they would review the classification of these bonds going forward and, of course, then reclassify them, which started the debate about what would happen. What were the options that the PUCs had at that point? So now there's a public announcement these bonds may be, you know, reclassified as ABS index and not corporate bonds. What realistic options did they have? Your opponent said once they got the interest rates and the request for issuance of bonds, it was too late. But at this earlier stage, could the PUC say, never mind, we'll find another way? The, you know, utility companies through State government will find other ways to finance? I'm just not sure what the options were. Sure. So two points on that, Your Honor. First is just to note the very public nature of the Bloomberg announcements, that plaintiffs rely on that in their complaint. Paragraph 188 is a public announcement that was open and notorious in that regard. But to answer Your Honor's question directly, there's nothing in the statutory scheme that says this is what we would otherwise consider. But in the joint appendix in the record on appeal, it's evident from the court, the utility, the regulator's consideration that the recovery bonds were viewed as the most economical option to finance the utility's needs to address these significant weather issues. As corporate or even under the new higher rates? They don't address that one way or the other. But it is clear that the recovery bonds are viewed as the most economical. But that is not the only way to finance whatever the utilities may need. While I'm not expert on this, there are many ways to either tap the capital markets or borrow funds that are through a different mechanism that maybe would not have been as economical for rate payers ultimately when those rates are passed on. But there would be other financing options available to the utilities in the way that, you know, a corporation can go out and finance or even a private company can go out and get financing. So it's not as though they're without recourse. They wouldn't issue the particular bonds that they had considered as part of the process. But I sort of see their argument as kind of like a fate and switch. You know, we went with this mechanism to fund, you know, this debt because of these storms, and all of a sudden Bloomberg switched the classification, which made it much more expensive. So I'm wondering what options were truly on the table at that point. I think at that point, Your Honor, they were aware. It was public that this change had been made. They saw the actual interest rates that were being charged, and they had the ability, it is very clear in the record, if they didn't take action five business days after the rates were submitted, the bonds were offered. But if they took action on the fourth day by noon, they could reject the bond offerings. And so they did have an option. They were knowledgeable. They were on notice. The rates were actually put before each of the PUCs, and they signed off on them. So if they did not think that the rates were as they had understood, and notably, to Your Honor's point on the timing, most of these happened after Bloomberg made its announcement, and therefore they would have been on notice that this reclassification had happened. And so they had all the information. They set forth a process knowing they wouldn't know the terms until right before. So you're emphasizing the second point in Simon. Simon also said they had the capacity to investigate wrongdoing. Do you concede that they didn't have that capacity here? We do, Your Honor, although I would submit that they didn't need it. Because in Simon – No, I understand you say it's not needed, but I just wanted to be clear that Simon did have a third point which seems not relevant here or not there. I would agree with that, Your Honor, subject to the proviso that it wasn't necessary to investigate here because the process was different and the PUCs had the ability to actually review and sign off on the rates before the bonds issued. Where in Simon, FERC did not do that. Yes, it set the market-based rate auction process, and it set a cap, but it never signed off on the rates in the way the PUCs did here. I do envision the factors in Simon as being weighed factors, not that all three have to absolutely be met. Indeed, Your Honor, and I'm obviously mindful of my time, but we do. And I think they don't have to apply rigidly. It's a balance based on the facts and circumstances presented. Thank you. Thank you, counsel. We'll hear from you. Thank you, Your Honors. The key is that this is about market-based rates. This is not a normal filed rate doctrine case. Simon said that review and approval by a regulator is not sufficient on its own for market-based rates. Instead, you need sufficient safeguards that come from, in Rothstein and Wegoland and those other cases, the regulators had the power to regulate, the power to change the rates that were in front of them. So the power to approve or reject in those cases. Let's assume you're correct that when it comes to the right to investigate or the ability to investigate as one of the three Simon factors, you win. It doesn't exist here. How does that change the equation if the other two factors are met? So none of the factors are met here, and Bloomberg concedes that. It's about, it's a qualitative question about are there sufficient safeguards against market manipulation. Here there's only one thing that the PUCs can do, which is withdraw approval for the entire bond issuance, which does not remedy the misconduct. So this is exactly where courts need to step in. Bloomberg has taken action that Plinkett alleges misconduct and that the PUCs cannot do anything about. There is nothing that, there's no filed rate doctrine case that has ever applied the filed rate doctrine in this kind of circumstance. As an example, yes, Your Honor. But in terms of the suit, the misconduct, if there is one, only causes your client damage if the rate is wrong. Isn't that right? I mean, you're claiming that the damage of a misconduct is because it resulted in a higher rate. So that whatever, it isn't a case of her saying you cannot sue somebody who has done me damage outside. The causation requires that this affected the rates, right? So if there is one thing that the PUCs can do, which is withdraw approval for the entire bond issuance, which does not remedy the misconduct, there is no filed rate doctrine case that has ever applied the filed rate doctrine in this kind of circumstance. Now, there is one thing that the PUCs can do, which is withdraw approval for the entire  One regulator in Rothstein even investigated that very issue and adopted a regulation restricting the kickbacks. So the Court deferred to those agencies because they were actually addressing the alleged misconduct, which is practically very similar to FERC's powers in Simon, which is why there were sufficient safeguards in Simon. But here, the PUCs cannot restrict Bloomberg's bond classification. They have — Bloomberg agrees that they don't have the expertise to address classification. The PUCs don't. They cannot order that affected interest rates be reduced, even if they knew about classification. Who chose the method for doing this? Who chose the method for this type of fundraising? So the PUCs — To satisfy the debt. Was it the PUCs? No. The State law permits utilities to issue bonds with — if they receive approval from PUCs. And although Bloomberg asserts — So the PUC had the ability to approve this process to use Bloomberg and this process to fund, to raise money to cover the debt, no? So State law permits — these are private utilities who can issue bonds, just like any other corporate entity. Right. But first, that's — it's — that does not justify the filed rate doctrine here, both for legally and factually. Legally, under Simon, it's contrary to Simon, which explicitly said it's not enough for a regulator to create a process, quote, ultimately corrupted by parties in the market. Instead, Simon said private, quote, remedies become more necessary as markets become increasingly dysregulated, which is why Simon said you need sufficient safeguards. And factually, PUCs have no choice. All bond interest rates are set in the U.S. bond market. That's how bonds work. PUCs recognize that bond interest rates are set in the free market, but they don't choose that. It's not true that they set up the bond market or that process. They have no alternative for how bond interest rates are set. Any other questions, Your Honors? Thank you, counsel. Thank you so much. Thank you both. We'll take the case under advisement.